**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

| | |
|---|---|
| **BRIAN LEE OWENS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **CIVIL ACTION NO. 1:11-00148** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**M E M O R A N D U M   O P I N I O N**

  This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 40 - 433, 1381-1383f. This case is presently pending before the Court on the parties' cross-Motions for Judgment on the Pleadings (Document Nos. 16 and 22.), Plaintiff's Motion for Remand (Document No. 17.), and Plaintiff's Reply. (Document No. 24.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 3 and 4.)

  The Plaintiff, Brian Lee Owens (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on January 10, 2008 (protective filing date), alleging disability as of October 1, 2007, due to "back pain, bad nerves, and left lung problems." (Tr. at 15, 58-60, 61-62, 82, 86.) The claims were denied initially and upon reconsideration. (Tr. at 34-36, 42-44, 417-20.) On December 10, 2008, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 46.) The hearing was held on April 22, 2010, before the Honorable Karen B. Peters. (Tr. at 431-85.) By decision dated June 23, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr.

at 15-30.) The ALJ's decision became the final decision of the Commissioner on February 18, 2011, when the Appeals Council denied Claimant's request for review. (Tr. at 7-10.) On March 8, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2010). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether

2

the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2010). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (C) *Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the

> degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, October 1, 2007. (Tr. at 17, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "borderline intellectual functioning; chronic obstructive pulmonary disease; low back pain of unknown etiology; depression; anxiety; bipolar disorder; and sleep apnea," which were severe impairments. (Tr. at 17, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 18, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for light exertional level work as follows:

> [T]he [C]laimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to several nonexertional limitations. More specifically, the [C]laimant would need to work indoors in an air-conditioned and heated clean environment free of excessive fumes, dust, etc. He would be able to occasionally crouch, crawl, and stoop, but would need to avoid

> climbing of ladders and exposure to heights. Due to limitations imposed by his mental impairments, he would need to avoid work with the public. He would be able to work with others but not on a cooperative or interactive basis.

(Tr. at 20, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 28, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform work as a production worker/assembler and electronic equipment assembler, at the light and unskilled level of exertion. (Tr. at 29-30, Finding No. 10.) On this basis, benefits were denied. (Tr. at 30, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on September 10, 1962, and was 47 years old at the time of the administrative hearing, May 13, 2010. (Tr. at 28, 58, 437-38.) Claimant had an eighth grade, or limited education, and was able to communicate in English. (Tr. 28, 91, 437, 447.) In the past, he worked as a construction worker II, woodworking machine feeder, and wood frame builder. (Tr. at 28, 87-88, 93-100, 437, 444-47.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred at step three of the sequential evaluation by failing to find that he met Listing of Impairments at 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05C. (Document No. 18 at 3-8.) He asserts that the ALJ improperly questioned the validity of Dr. Steward's IQ scores based on his school records, invalid MMPI-2 test results, his opinion that he was not mentally retarded, his passing grades in school, and his marriage of 28 years to his wife. (Id. at 4-8.) Regarding school records, Claimant asserts that deficits in adaptive functioning do not need to arise from school records. (Id. at 4-5.) He further asserts that when in school, he was placed in special education classes, which illustrated deficits in adaptive functioning prior to age 22. (Id. at 5.) Respecting the test results, Claimant asserts that the ALJ erred in finding Dr. Steward's IQ scores invalid because the MMPI-2 results were invalid and the tests were administered at the same time. (Id. at 5.) Claimant notes that Dr. Steward found the IQ scores were valid and reliable and asserts that pursuant

to the holding in Elswick v. Apfel, Civil Action No. 1:97-00907 (S.D. W.Va. 1998), the ALJ should not have determined on her own that the IQ scores were invalid. (Id.)

Claimant next asserts that the ALJ was not permitted to reject valid IQ scores simply because a claimant was having emotional problems and did not believe he was mentally retarded. (Id. at 6.) He also asserts that the ALJ relied too heavily on his school grades and that he only received passing grades in school because he was in special education classes. (Id.) Finally, Claimant asserts that it was ridiculous for the ALJ to reject Dr. Steward's IQ scores on the basis of the length of his marriage and his wife's intellectual functioning. (Id. at 7-8.)

Claimant further contends that the ALJ improperly rejected the entirety of Dr. Steward's opinion for three reasons. (Id.) First, Claimant asserts that his opinion was rejected improperly in part because he was referred to Dr. Steward by his attorney, which was found disturbing in Elswick. (Id.) Second, Claimant asserts that Dr. Steward's opinion was questioned because he had a low GAF score, which indicated that the ALJ invalidated "testing procedures because of her perceived notions as to the importance of a GAF score." (Id. at 8.) Finally, Claimant asserts that the ALJ improperly attacked the results of all other psychological tests by challenging Dr. Steward's interpretations. (Id.)

In response, the Commissioner asserts that the evidence failed to establish deficits in adaptive functioning prior to age 22. (Document No. 22 at 18-22.) Respecting the first element of Listing § 12.05C, the Commissioner first asserts that the school records were inconsistent with a finding of mental retardation as Claimant earned As and Bs and failed to substantiate that Claimant was in special education classes, despite the ALJ's finding that he was. (Id. at 18.) Second, the Commissioner asserts that Claimant's acknowledged activities were inconsistent with a person who suffered significant deficits in adaptive functioning which manifested before the age of 22. (Id. at

8

19.) Third, the Commissioner asserts that Dr. Horsford assessed a GAF of 70 in 2009, which was at odds with an individual with significant adaptive deficits. (Id. at 20.) Regarding the second element of Listing § 12.05C, which required a valid IQ score between 60 and 70, the Commissioner asserts that the ALJ was entitled to reject Claimant's IQ scores because they were inconsistent with the record as a whole. (Id. at 20-21.) The Commissioner asserts that the record as a whole discounted Claimant's IQ scores for the following reasons: (1) Claimant's treating psychiatrist, Dr. Horsford, diagnosed only borderline intellectual functioning; (2) Dr. Steward's evaluation was conducted at the request of Claimant's counsel to assist his disability claim; (3) Claimant's IQ scores were inconsistent with his reported activities; (4) Claimant did not allege disability based on mental retardation; (5) Claimant's MMPI-2 test results revealed an F scale score four standard deviations above the mean, which was indicative of symptom exaggeration. This result calls into question whether Claimant performed to the best of his ability during IQ testing; and (6) Claimant's school records indicated that he earned primarily As and Bs when in school and failed to indicate that he was placed in special education classes. (Id. at 21-22.)

In Reply, Claimant asserts that the Commissioner's brief was more expansive than the ALJ's decision, and advanced arguments never mentioned by the ALJ. (Document No. 24 at 2.) Claimant notes that the Commissioner argued that the school records failed to indicate that he was in special education classes, but the ALJ found in her decision that he was, which according to Claimant explained As and Bs. (Id.) Claimant next notes that the Commissioner added a myriad of examples to his reasoning that the ALJ's decision is supported by substantial evidence. (Id. at 3.) Specifically, the Commissioner added washing dishes, picking up the mail, visiting his mother, and listening to music as examples of activities not cited by the ALJ. (Id.) Finally, Claimant asserts that in addition

9

to the ALJ's decision, the Commissioner improperly compared his GAF score to deficits in adaptive functioning, and at that, he selected only one score from the record. (Id.)

Claimant next asserts that the Commissioner advanced his theory that Claimant should have showed deficits in adaptive functioning prior to age 22 by introducing evidence of his reform school, arrests, and imprisonment. (Id. at 3.) Claimant contends that these records did not demonstrate deficits in adaptive behavior because they could have resulted from a lack of a stable home life or discipline. (Id.) Finally, Claimant asserts that regarding his IQ scores, the Commissioner failed to address Elswick in his brief and provided additional bases not contained in the ALJ's decision supporting the ALJ's finding that Claimant's IQ scores were invalid. (Id. at 4-5.)

1. Listing §12.05C.

Claimant first alleges that the ALJ erred in not finding that he met Listing Impairment § 12.05C. (Document No. 18 at 3-8.) "The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity," regardless of age, education or work experience, see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990); 20 C.F.R § 416.925(a) (2010). Section 12.05 of the Listing of Impairments provides criteria for determining whether an individual is disabled by mental retardation or autism. "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2010). The required level of severity for Listing 12.05 is satisfied when any one of the four following requirements is satisfied:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions,

such that the use of standardized measures of intellectual functioning is precluded;

OR

      B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

      C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

      D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
        1. Marked restriction of activities of daily living; or
        2. Marked difficulties in maintaining social functioning; or
        3. Marked difficulties in maintaining concentration, persistence, or pace; or
        4. Repeated episodes of decompensation, each of extended duration.

Because the evidence does not establish that Claimant was dependent on others for personal needs or that she had marked restrictions or repeated episodes of decompensation, the ALJ focused her analysis on the absence of deficits in adaptive behavior and on the verbal, performance, and full scale IQ scores. To meet the criteria of § 12.05C, Claimant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2010). The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C. Luckey v. United States Dep't of Health & Human Serv., 890 F.2d 666 (4th Cir. 1989) (per curiam). A "severe" impairment is one "which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2010). In Luckey, the Court ruled that:

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of section 12.05C. Further, the Secretary has defined a severe impairment or combination of

11

>impairments as those which significantly limit an individual's physical or mental ability to do basic work activities. The Secretary's finding that Luckey suffers from a severe combination of impairments also establishes the second prong of section 12.05C.

Id. at 669 (internal citations omitted).

As described in the introduction to the Listing, and as stated by the ALJ, one of the essential features of mental retardation is significant deficits in adaptive functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; See also The Merck Manual of Diagnosis and Therapy 3044 (Mark H. Beers, M.D. & Robert S. Porter, M.D., eds., 19th ed. 2011) (defining mental retardation, now referred to as "intellectual disability," as "significantly subaverage intellectual functioning (often expressed as an intelligent quotient < 70 to 75) combined with limitations of > 2 of the following: communication, self-direction, social skills, self-care, use of community resources, and maintenance of personal safety. Management consists of education, family counseling, and social support).[2] Also, according to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, (DSM-IV)(1994), one of the essential features of mental retardation is significant deficits in adaptive functioning. Id. at 39-40. Adaptive functioning refers to how effectively an individual copes with common life demands and how well she meets the standards of personal independence expected of someone in her particular age group, sociocultural background, and community setting.[3] Id. at 40.

---

[2] "In 1992 the American Medical Association on Mental Retardation changed the definition of mental retardation to reflect adaptation to the environment and interaction with others by a person with limited intellectual functioning. Classification based on IQ alone (mild, 52 to 68; moderate, 36 to 51, severe, 20 to 35; profound, less than 20) has been replaced to that based on level of support needed." *The Merck Manual of Diagnosis and Therapy* 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999).

[3] The Regulations define "adaptive activities" to include "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(1)(2010).

The Regulations make clear that Listings 12.05C is a three-part test. The Introduction to section 12.00 of the Listings, section 12.00A, was revised in 2000 to state as follows:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; 65 Fed. Reg. 50, 746, 50, 776; see also Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (detailing change).

In her decision, the ALJ concluded that Claimant did not meet Listing §12.05. (Tr. at19-20.) Regarding the introductory language of the Listing, the ALJ concluded that the record did not establish an onset of the impairment prior to age 22, as required by the initial language of §12.05. (Tr. at 20.) Regarding § 12.05C, the ALJ concluded that Claimant did not have a valid IQ score between 60 and 70. (Id.).

The record reveals that Dr. L. Andrew Steward, a licensed psychologist, conducted a psychological evaluation and the only intellectual testing of record, on April 20, 2009. (Tr. at 20, 359-65.) Results of the WAIS-III revealed a verbal IQ of 72, a performance IQ of 73, and a full scale IQ of 70. (Tr. at 20, 362.) Dr. Steward reported that Claimant was below average in all areas of intellectual abilities measured and opined that his full scale IQ fell within the mild mental retardation range. (Tr. at 20, 363.) He further opined that Claimant's level of intellectual functioning was a "lifelong condition based upon educational, employment, behavioral, and test performances." (Tr. at 20, 365.) Results of the MMPI-II indicated that Claimant was elevated significantly in nine clinical areas, including those areas that measured anxiety and depression. (Tr. at 20, 363-64.) The validity scale F however, was over four standard deviations above the mean, which indicated that Claimant possibly exaggerated his symptoms. (Tr. at 20, 24, 363-64.) The BAI and BDI-II revealed

severe ranges of depression and anxiety. (Tr. at 20, 363.) Dr. Steward concluded that the results of the testing were valid and reliable because Claimant appeared to have tried diligently on testing. (Tr. at 20, 359.) He diagnosed major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; bipolar disorder not otherwise specified and by previous reports; intermittent explosive disorder by history; mild mental retardation; and assessed a GAF of 46. (Tr. at 20, 364-65.) Dr. Steward opined that Claimant was "permanently and totally disabled from any type of gainful employment." (Id. at 20, 365.)

In her decision, the ALJ concluded that the validity of Dr. Steward's evaluation was questionable for several reasons. (Tr. at 20, 24-25.) First, the ALJ noted that the MMPI-II and the WAIS-III were administered at the same time. (Tr. at 20, 24.) Nevertheless, because the MMPI-II results suggested possible symptom exaggeration, the ALJ questioned the validity of the WAIS-III results, despite Dr. Steward's statement that the results were valid and reliable. (Id.) Claimant, citing this District Court's opinion in Elswick, asserts that an ALJ may reject IQ scores if inconsistent with other IQ evidence, but must not equate a negative comment with invalidity. (Document No. 18 at 5-6.) Claimant asserts that the ALJ in the instant case improperly interpreted an elevated F score on the MMPI-II, by "relying upon her own in expertise" and concluded that a battery of testing results were questionable. (Id. at 6.)

In Elswick, an examining psychologist stated that Mr. Elswick's verbal IQ of 67, performance IQ of 68, and full scale IQ of 66, were a slight underestimate of his general level of intellectual functioning because he may not have put forth his full effort. (Id. at 6.) The ALJ concluded that the IQ scores were invalid based on the examiner's statement that they underestimated his level of intellectual functioning. (Id. at 12-13.) This Court held that an ALJ may reject IQ scores if they are inconsistent with other evidence of the claimant's level of intellectual

14

functioning, but "may not simply equate any negative comment with a finding of invalidity." (Id. at 15.) The Court noted that the rejected IQ score was the only one of record and that a full scale IQ of 66 allowed for a four-point margin of error that would still fall within the listing range. (Id.) Therefore, even if underestimated by four points, the claimant's IQ still met the IQ requirement of § 12.05C. (Id.) The case was remanded for a proper determination as to the validity of the claimant's IQ. (Id.)

The Fourth Circuit recently held that "an ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." Hancock v. Astrue, 667 F.3d 470, 474 (4th Cir. 2012). In this case, intelligence testing ordered by the ALJ revealed a verbal IQ of 66, a performance IQ of 67, and a full scale IQ of 63, and the examine concluded that Ms. Hancock was functioning in the mild level of mental retardation. Id. at 473. The examiner however, failed to attest to the validity of the test results or opined that Ms. Hancock put forth her best effort. Id. The ALJ gave little weight to the examiner's opinion and found that Ms. Hancock did not meet § 12.05C because the examiner never averred that her IQ scores were valid or that she gave her best effort on testing. Id. Without determining whether an examiner's omission to attest to the validity of scores alone is sufficient to support an ALJ's decision to discredit the only IQ scores of record, the Fourth Circuit held that the ALJ's decision to reject the IQ scores was supported by substantial evidence where the ALJ relied on the examiner's omission and the inconsistency of the results with Ms. Hancock's actual functioning and with the treating psychiatrists' notes. Id. at 475. In reaching its decision, the Circuit Court followed the holdings of its sister circuits that have permitted an ALJ to reject the only IQ scores of record in certain circumstances. Id. at 474; See Lax v. Astrue, 489 F.3d 1080, 1086-87 (10th Cir. 2007 (scores not accurate reflection of intellectual capabilities in light of other evidence); Markle v. Barnhart, 324

F.3d 182, 186 (3d Cir. 2003) (scores inconsistent with ability to care for oneself and perform activities of daily living); Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998) (scores derived from "first and only meeting" with examiner and were inconsistent with record of functional ability and prior medical record); Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that a "valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior"); Muse v. Sullivan, 925 F.2d 785, 789-90 (5th Cir. 1991)(per curiam) (scores inconsistent with job history, past medical records, and showing of good memory; claimant unable to see during examination); Popp v. Heckler, 779 F.2d 1497, 1499-1500 (11th Cir. 1986)(per curiam) (scores inconsistent with academic achievement; claimant trying to appear unfavorable).

In the instant case, the ALJ rejected the only IQ scores of record, which Dr. Steward found were valid and reliable. The Court finds that pursuant to the holding in Hancock, the Court finds that the ALJ properly considered the IQ scores in light of all the evidence record and rejected them as inconsistent therewith. As discussed above, the ALJ rejected the IQ scores in part because the MMPI-II results suggested symptom exaggeration, implying that possibly Claimant could have not given his best effort on intellectual testing. (Tr. at 20, 24-25.) She further noted that the BDI and BAI consisted of self-reported allegations of depression and anxiety. (Id.) She surmised that such questions may not have been honestly completed when answering with a motive of secondary gain, such as obtaining disability benefits. (Tr. at 25.)

In rejecting the IQ scores, the ALJ also noted Claimant's reports that he could read and write a little, did not believe he was mentally retarded, had sustained a long-term marriage for 28 years with his wife who was mentally retarded, and performed past work that required some degree of mental acuity. (Tr. at 20.) The ALJ also noted Claimant's reported activities, which included

16

performing his self-care needs, mowing the grass at times, washing dishes, driving a vehicle, caring for the dogs, walking to the post office daily, watching television, playing cards, and managing his finances. (Tr. at 18.) The ALJ also referenced Claimant's education and noted that he was placed in special education classes where he earned passing grades, primarily As and Bs. (Tr. at 20.) Finally, the ALJ noted that Claimant's treating psychiatrist opined that his intellectual functioning was at the borderline level and that Dr. Horsford concluded in January and February, 2009, that his GAF score was 70, contrary to Dr. Steward's assessed GAF of 46, for which the ALJ suggested should have caused Dr. Steward to recommend immediate treatment, but he did not. (Tr. at 20, 24.)

For essentially, the same reasons, the ALJ also determined that Claimant did not suffer deficits in adaptive functioning prior to age 22. (Tr. at 20.) The ALJ found that Claimant participated in special education classes in school. (Id.) Claimant therefore argues that his education established deficits in adaptive functioning prior to age 22. Though Claimant may have taken special education classes, he received passing grades and went on to perform substantial gainful activity. See Accordingly, the Court finds that despite Claimant's limited education, he did not demonstrate deficits in adaptive functioning prior to age 22.

2. Claimant's Motion for Remand.

Claimant also alleges that this matter must be remanded for consideration of Dr. Horsford's psychiatric evaluation report dated February 19, 2010, and treatment notes, which were not submitted to the ALJ or the Appeals Council. (Document No. 18 at 8-10.) Claimant asserts that the February 19, 2010, report included new diagnoses and a GAF score of 40, which represented a worsening of Claimant's mental health. (Id. at 9-10.) Claimant asserts that the additional records were requested from Dr. Horsford in preparation for the administrative hearing and the argument for the Appeals Council. (Id. at 9.)

17

In response, the Commissioner asserts that the additional evidence is neither new nor material. (Document No. 22 at 23-24.) The evidence is not new because it was available to Claimant during the administrative proceedings and could have been submitted to the ALJ at least one month prior to the hearing and nearly two months before he issued his decision. (Id. at 24.) The evidence also is not material because although the treatment notes revealed a GAF score of 40 on February 19, 2010, such score represented only a "temporary exacerbation or worsening" of Claimant's mental symptoms in view of Claimant's assessed GAF scores throughout the medical record. (Id. at 24-25.) Finally, the Commissioner argues that the ALJ did not establish good cause for failing to provide the evidence earlier because Claimant was deemed to have known of its existence prior to the ALJ's decision as he was the subject of the evaluation and because Claimant's counsel acknowledged that she obtained Dr. Horsford's report subsequent to the ALJ's decision but neglected to include it in the evidence submitted to the Appeals Council. (Id. at 25.)

Pursuant to 28 U.S.C. § 405(g), remand is warranted "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]"[4] The Fourth Circuit has stated that "[e]vidence is material

---

[4] Sentence six of 42 U.S.C. § 405(g) provides:

The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

if there is a reasonable possibility that the new evidence would have changed the outcome." <u>Wilkins v. Secretary, Dep't of Health & Human Serv.</u>, 953 F.2d 93, 96 (4th Cir. 1991)(*en banc*). The new evidence must "relate to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). This does not mean that the evidence had to have existed during that period. Rather, evidence must be considered if it has any bearing upon whether the Claimant was disabled during the relevant period of time. <u>See</u> <u>Wooldridge v. Bowen</u>, 816 F.2d 157, 160 (4th Cir. 1987); <u>Cox v. Heckler</u>, 770 F.2d 411, 413 (4th Cir. 1985); <u>Leviner v. Richardson</u>, 443 F.2d 1338, 1343 (4th Cir. 1971).

The Court is persuaded by the Commissioner's argument and finds that Dr. Horsford's psychiatric evaluation report and treatment records neither are new nor material, and that Claimant has failed to demonstrate good cause for not submitting the records prior to the ALJ's decision. The records are not new in the sense that they ee dated prior to the ALJ's decision and the Appeals Council's decision. With the exception of the diagnoses, Dr. Horsford's records do not add anything significant to the record. Although the ALJ assessed a GAF of 40 on February 19, 2010, such assessment most likely would not have changed the ALJ's decision, for the reasons asserted by the Commissioner. In viewing all of Claimant's assessed GAF scores, the February 19, 2010, score is nothing more than a temporary exacerbation of his symptoms. In March, 2010, Dr. Horsford assessed a GAF of 70 and in May, 2010, assessed a GAF of 80. The additional evidence therefore, is not material. Finally, the Court finds that Claimant has not demonstrated good cause for her failure to submit the evidence to the ALJ or the Appeals Council. As the Commissioner points out, Claimant was the subject of the evaluation and office visits, and therefore, was aware of the existence of the additional evidence. Moreover, as the Commissioner asserts, Claimant's counsel "neglected" to submit the records to the Appeals Council. Although the Appeals Council did not

contact Claimant to advise of the missing records, it was Claimant's responsibility to provide any additional evidence. Furthermore, though Dr. Horsford's office did not provide the records to Claimant when requested, Claimant had ample opportunity to provide the records at least to the Appeals Council. Accordingly, the Court finds that Claimant neither demonstrated that the additional evidence was new nor material, and that Claimant failed to establish good cause for not submitting the evidence to the Appeals Council.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motions for Judgment on the Pleadings (Document No. 16.) and Motion for Remand (Document No. 17.) are **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 22.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: September 28, 2012.

R. Clarke VanDervort
United States Magistrate Judge